## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

RUTH E. DEJONG,

        Plaintiff,

v.                                                                                      No. CIV 00-0151 BB/RLP

COMPUSA, INC., a Texas Corporation,

        Defendant.

### MEMORANDUM OPINION AND ORDER

      THIS MATTER comes before the Court for consideration of Defendants' motion for summary judgment (Doc. 46) and motion to strike Plaintiff's expert witness (Doc. 42). The Court has reviewed the submissions of the parties and the relevant law, and, for the reasons set forth below, finds that the motion for summary judgment will be granted in part and denied in part. Also, it is this Court's usual practice to hold a hearing prior to deciding a *Daubert* challenge to an expert witness, so that issue will be deferred until after such a hearing.

      Plaintiff was employed by Defendant as the "tech manager" of Defendant's Albuquerque store. This case arises out of Plaintiff's resignation from that position in January 1999. Plaintiff maintains her resignation amounted to a constructive discharge, motivated by gender bias and retaliation for her exercise of her right to protest against that bias. Defendant disagrees, and has filed a motion for summary judgment.

      "Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed.

R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." Id. On a motion for summary judgment, the issue is "not whether [the court] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "Nevertheless, a jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to create a jury question." Walker v. NationsBank of Florida, 53 F.3d 1548, 1555 (11th Cir. 1995). The Court will consider Defendant's motion in light of these standards.

**Facts**

Viewed in the light most favorable to Plaintiff, the following evidence was presented to the Court during the summary-judgment briefing process. Most of the significant events in this case occurred during the fall of 1998 and January 1999. During this time, individuals who were part of Defendant's regional management structure established budget requirements, or quotas, which Plaintiff's tech department was supposed to meet. Plaintiff's immediate supervisor, Mr. Adrian Narvaez, testified these budgets were unrealistic and unattainable in Albuquerque. Although he spoke to the regional management personnel several times about the budgets, attempting to have them changed, nothing was done. Also during this period, the regional tech manager, Todd Gregson, was overheard by Brian Poitras, one of Plaintiff's technicians, making a statement to the effect that women are "too soft" to be tech managers. Poitras also overheard Gregson telling someone that Plaintiff was "going down," was "on her way out," and that only Narvaez was standing in the way.[1]

---

[1] These overheard statements, as well as other hearsay-sounding statements discussed *infra*, are admissible for two reasons: they are not offered for the truth of the statements, but to show the state of mind of Defendant's management personnel; also, they are admissions of a party-opponent, since they were made by management-level individuals in the course of their employment. *See Equal Employment Opportunity Com'n v. HBE Corp.*, 135 F.3d 543, 552 (8th Cir. 1998); *Ryder v.*

Poitras reported this to Plaintiff, who was surprised and upset. Another member of management, Doug Willey, testified that he heard Gregson say, at a meeting of managers, that women are not tough enough to be tech managers. Willey also admitted telling Plaintiff she was a mother hen, and "babied" her techs.[2]

Narvaez himself testified that he was being pressured to take steps to force Plaintiff out of her position as tech manager. His ratings as a manager suffered because he was "dragging his feet" with regard to Plaintiff, and the reason he was reluctant to discipline her was his belief she was performing her job well. He also, as discussed above, felt that unreasonable expectations were being placed on Plaintiff. In December, he had a conversation with Plaintiff in which she indicated she might need to take a medical leave of absence. Narvaez communicated that to Gregson, and within twenty minutes another regional-management figure, Bill Wright, was on the phone to Narvaez telling him this would be a good opportunity to remove Plaintiff from her position, because they could not guarantee her the tech manager position when she returned from her medical leave.[3] Two or three days later, Gregson came to Albuquerque and ran into Plaintiff in the store parking lot, where he told her he was here to replace her. She informed Gregson she was not taking the leave of absence. Gregson then wrote an e-mail to Wright, telling Wright that Narvaez "does not seem to want to deal with the problem of counciling (sic) Ruth and then firing her."

---

*Westinghouse Elec. Corp.*, 128 F.3d 128, 134 (3d Cir. 1997).

[2]Willey was the retail manager of the Albuquerque store, and was therefore at the same level of management as Plaintiff, rather than a superior level.

[3]According to Narvaez, Wright did not like Plaintiff, did not want her in her position, and wanted him (Narvaez) to take steps to remove her. Narvaez testified that Wright had been influenced by a prior regional management figure who did not want women as tech managers and who told Wright Plaintiff should be removed. All of this information is double-hearsay and speculation, and therefore the Court has not considered it in deciding this motion.

Gregson immediately drew up an action plan, requiring Plaintiff to meet certain goals. Narvaez testified that it was widely understood within Defendant's management structure that setting up an action plan, a form of "counseling" an employee, is the first step in a dismissal process--if the employee does not meet the action plan requirements, she will be out. Narvaez also testified that he disagreed with several aspects of the action plan. For one thing, the plan required Plaintiff to "capture all corporate courier business," a line of business that according to Narvaez was non-existent in the Albuquerque area. For her part, Plaintiff told Poitras the requirements of the action plan would be virtually impossible to meet. She also told Narvaez she was afraid she was going to be terminated. At some time close to this incident, Plaintiff was in Narvaez' office when Narvaez telephoned Wright to tell him one of Plaintiff's staff had resigned. Wright, in what both Narvaez and Plaintiff testified was a sarcastic tone, asked whether the resignation was because of "the tech manager." After this conversation, Narvaez told Plaintiff to start documenting everything, in order to protect herself and "CYA." Not long after the institution of the action plan and the phone call with Wright, Narvaez resigned from his employment with Defendant. Before he left, he told Plaintiff to watch herself.

Around this time, Plaintiff spoke with a human-resources employee, Sue Zacchini, about her problems with gender discrimination she felt she was experiencing from management personnel. Ms. Zacchini allegedly told Willey, the retail manager, about this conversation. Willey then asked Plaintiff about the conversation, wondering why she felt she might have a claim against the company. Plaintiff informed Willey she felt she was being forced out of her position because she was a woman. Subsequently, at a meeting on January 11, 1999, Willey harshly criticized Plaintiff, telling her she was not making the company any money, she was mothering her techs, she was not tough enough to be a tech manager, and making other critical statements. Another male employee attending the meeting, John Chavez, told Plaintiff he could do a better job as tech manager than she could. Plaintiff told

4

Chavez he was probably the better man for the job, and walked out of the meeting. She then resigned her employment with Defendant, giving thirty days' notice. Instead of waiting thirty days, Defendant terminated her employment on January 18 and had her escorted from the premises.

**Discussion**

**Title VII Constructive Discharge Claim:** Plaintiff maintains her resignation was actually a constructive discharge, caused by a hostile work environment. Defendant, on the other hand, maintains the gender-based harassment was not severe enough or pervasive enough, as a matter of law, to constitute a hostile work environment. If the only test applicable to this case were the "severe and pervasive harassment" theory discussed by Defendant, this would be a closer case. As Defendant points out, sporadic comments, such as the isolated "women are not tough enough to be tech managers" or "you are mothering your techs" statements set out above, are less likely to be found to create a hostile work environment. *See Bolden v. PRC Inc.*, 43 F.3d 545 (10th Cir. 1994). However, these statements must be viewed in conjunction with the evidence that Defendant was setting Plaintiff up for termination, and making deliberate efforts to force her out. Where an employee reasonably believes termination motivated by gender bias is inevitable, and resigns rather than wait for termination, a constructive discharge actionable under Title VII has occurred. *See Burks v. Oklahoma Publishing Co.*, 81 F.3d 975, 978 (10th Cir. 1996) (employee can prove constructive discharge under Title VII by showing that she was faced with a choice between resigning or being fired); *Guthrie v. J.C. Penney Co., Inc.*, 803 F.2d 202, 207 (5th Cir. 1986) (where there was evidence employee reasonably perceived termination was inevitable, jury's finding of constructive discharge was supported by that evidence); *cf. Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998) (stating, in dictum, that constructive discharge theory exists to give Title VII protection to a plaintiff who decides to quit rather than wait around to be fired). Similarly, a "finding

of constructive discharge is supported by evidence that an employee has resigned, rather than waiting to be fired, because of unreasonably harsh conditions that have been applied to him in a discriminatory fashion." *Spulak v. KMart Corp.*, 894 F.2d 1150, 1154 (10th Cir. 1990). The focus of these cases is not the severity or pervasiveness of sexist, ageist, or racist comments or actions. Instead, the focus is on the defendant employer's attempts to force out the employee. The evidence concerning biased comments then is simply considered evidence as to the employer's motivation for its actions.

In this case, there is ample evidence that Defendant's regional management personnel wanted Plaintiff removed from her position. There is also evidence, in the form of Gregson's comments concerning women not being tough enough to be tech managers, that the motivation for the desire to force Plaintiff out was the fact that she is a woman. Finally, there was evidence that she was being set up for termination, because she had been given budget requirements that were unrealistic and an action plan that would be impossible to meet. Given this evidence, Plaintiff has raised a genuine issue of material fact as to whether a reasonable employee in her position would have felt that termination was inevitable and was motivated by gender bias, and therefore as to whether her resignation was actually a constructive discharge actionable under Title VII. Therefore, summary judgment will be denied on this claim.

**Title VII Retaliation Claim:** Plaintiff maintains that after Doug Willey found out she had complained to Ms. Zacchini of the human resources office, he retaliated against her by haranguing her in the January 11 meeting. In order to state a claim for Title VII retaliation, Plaintiff was required to submit evidence showing that she engaged in protected conduct under Title VII, that she suffered an adverse employment action following that protected conduct, and that there was a causal connection between the adverse employment action and the protected conduct. *See Berry v. Stevinson Chevrolet*, 74 F.3d 980, 985 (10th Cir. 1996). In this case, there is insufficient evidence

6

of an actionable adverse employment action.  Retaliatory conduct other than discharge or refusal to rehire is actionable under Title VII only if it alters the employee's compensation, terms, conditions, or privileges of employment.  *See Heno v. Sprint/United Management Co.*, 208 F.3d 847, 857 (10th Cir. 2000).  Willey's conduct at the meeting, even though it was critical of Plaintiff's performance and personality, did not change the conditions of her employment, reduce her pay, transfer her to a different workstation, or alter in any way her official job status.  Therefore, that conduct cannot be the basis of a retaliation claim.

Plaintiff maintains the adverse employment action that can be actionable as retaliation was her constructive discharge.  However, most of the actions leading to her resignation were taken before she engaged in the protected conduct of complaining to Zacchini.  Furthermore, most of the relevant actions were taken by Gregson and Wright, and there is no evidence they even knew of her complaints.  The possible constructive discharge, therefore, was largely caused by actions that could not be considered retaliation for Plaintiff's complaints to Zachini.  *See Cisneros v. Wilson*, 226 F.3d 1113, 1133 (10th Cir. 2000) (where alleged retaliatory act occurred before plaintiff engaged in protected conduct by filing EEOC charge, plaintiff's retaliation claim failed because plaintiff could not establish one element of retaliation claim--that adverse employment action was suffered subsequent to, or contemporaneous with, protected conduct).  Willey is the only person, according to the evidence submitted by Plaintiff, who was told of her complaints, and he is the only one who acted after those complaints.  His actions, standing alone, even if taken for purposes of retaliation, cannot be considered a constructive discharge.  Criticisms of Plaintiff and her performance at one meeting, by someone who had no authority to fire her, do not rise to a level allowing a reasonable employee to feel that termination was inevitable, or that working conditions were so intolerable that she had no choice but to quit.  In sum, Willey's conduct cannot be considered an actionable adverse

employment action under Title VII, and the other conduct forming the basis of the constructive-discharge claim cannot be considered retaliatory. Therefore, the Title VII retaliation claim will be dismissed.

**State-law Retaliation Claim:** As with the Title VII retaliation claim, Plaintiff maintains that her constructive discharge can be considered a retaliatory discharge, executed in response to her complaints to Zacchini. Plaintiff therefore characterizes this claim as a retaliatory-discharge claim, and argues that New Mexico recognizes such a claim where a discharge has occurred as a result of an act protected by public policy. Again, the Court might agree with Plaintiff if her alleged constructive discharge could be considered retaliation for her complaints to Zacchini. As discussed above, however, the only retaliatory conduct that occurred in this case was Willey's harsh criticism of Plaintiff at the January 11 meeting. This criticism was only the last event in the series of events leading to the alleged constructive discharge, and given Willey's lack of hiring and firing authority over Plaintiff it was not one of the more significant events. Therefore, the constructive discharge cannot be attributed to retaliatory motives. In essence, Plaintiff's claim is only that Willey retaliated against her by unfairly and harshly criticizing her at a meeting; this claim cannot rise to the level of a retaliatory-constructive-discharge claim. Dismissal of the state-law retaliatory-discharge claim is appropriate.

**Intentional Infliction of Emotional Distress:** Under New Mexico law, to establish a claim for intentional infliction of emotional distress, a plaintiff must show the defendant engaged in extreme and outrageous conduct, done recklessly or with the intent to cause severe emotional distress. *See Silverman v. Progressive Broadcasting, Inc.*, 125 N.M. 500, 509, 964 P.2d 61, 70 (Ct. App. 1998). The plaintiff must also show that as a result of the conduct, she suffered severe emotional distress. *See id.* In this case, the Court has considerable doubt about whether the actions attributed to

Defendant's management personnel would be considered extreme and outrageous. Perhaps the conduct coming closest to that standard would be Willey's alleged acts of yelling at Plaintiff in front of customers, and throwing an item across her office. However, the Court need not decide that issue, because it is clear Plaintiff has presented no evidence indicating she suffered severe emotional distress as a result of the events leading to her resignation.

Plaintiff testified in her deposition that during the year following her resignation, she suffered no physical or mental limitations other than those caused by unrelated surgery performed in the spring, and those caused by carpal tunnel syndrome. She also testified that she home-schooled her children in 1999, and had no problem doing that. Plaintiff declined to take any medication during the period in question, although her physician recommended that she do so. In addition, Plaintiff never spoke to a counselor, although she did have a few conversations with her pastor's wife about the employment problems. The most that can be said concerning Plaintiff's emotional state is that she was reduced to tears at times during her employment with Defendant, and ended up quitting her job because she could not take it any more. This is not distress so severe that no reasonable person could be expected to endure it. *See id.*, 125 N.M. at 510, 964 P.2d at 71 (stating standard for severity of distress required to state claim for intentional infliction of emotional distress); *compare Coates v. Wal-Mart Stores, Inc.*, 127 N.M. 47, 54, 976 P.2d 999, 1006 (1999) (after sexual assaults, plaintiffs suffered distress including claustrophobia, inability to leave the house, excessive weight gain, insomnia, and fear). The distress suffered by Plaintiff in this case is no more severe than the distress unfortunately suffered by many people who are in highly unpleasant employment situations. As such, it is not actionable. Summary judgment will therefore be granted on the claim of intentional infliction of emotional distress.

**Prima Facie Tort:**  Plaintiff presented no argument in response to Defendant's motion with respect to this claim, and the Court finds no genuine issue of material fact that would support such a claim.  *See Silverman* (if employer discriminated against plaintiff, prima facie tort theory not viable because no lawful act was committed, and commission of a lawful act is one element of the prima facie tort cause of action).  Summary judgment will therefore be granted on this claim as well.

**Motion to Exclude Plaintiff's Economist:**  Defendant maintains the testimony of Plaintiff's economist should be excluded because his proposed testimony does not meet the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  According to the Tenth Circuit, the most common method for district courts to fulfill their gatekeeping function as required by *Daubert* is to hold a hearing on the matter.  *See Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000).  The Court agrees this is the best procedure to follow, and will therefore hold a *Daubert* hearing prior to trial.

**Conclusion**

Based on the foregoing, the Court will grant Defendant's motion for summary judgment as to all claims except the Title VII hostile-environment/constructive-discharge claim.

**ORDER**

A Memorandum Opinion having been issued in this case, it is hereby ORDERED as follows: Defendant's motion for summary judgment (Doc. 46) is GRANTED in part and DENIED in part, and Defendant's motion to exclude Plaintiff's expert (Doc. 42) is held in abeyance pending a hearing.

Dated this 9th day of February, 2001.

_____
BRUCE D. BLACK
United States District Judge

**ATTORNEYS**:

**For Plaintiff**:
Christopher M. Moody
Whitney Warner
Noeding & Moody, P.C.
4300 San Mateo Blvd. N.E., Suite B260
Albuquerque, New Mexico 87110

**For Defendant**:
Ronald E. Manthey
Ann Marie Painter
Melissa M. Hensley
Littler Mendelson, P.C.
2001 Ross Ave., Suite 2600
Dallas, Texas 75201

Martin Esquivel
Dines, Gross & Esquivel, P.C.
6301 Indian School Road, N.E., Suite 900
Albuquerque, New Mexico 87110